ing capital and reduced its ability to pay back its own seasonal borrowing to the Harris Bank.

 From the foregoing consideration of all the many factors involved, Bordo's status as a creditor of Pitt emerges clearly. Accordingly, upon Pitt's ultimate failure to repay the loan balance of approximately $740,000, Bordo suffered a bad debt loss within the meaning of section 166.

There remains only the secondary question of whether, in addition, Bordo is entitled to deductions for certain depreciation expenses, abandonment losses, salary and travel expenses, legal and accounting fees, and stock escrow and settlement expenses, all connected directly to the Bordo-Pitt transaction. The facts with respect to these several items are detailed in findings 84 through 89. (See commissioner's report of November 29, 1972.) It is sufficient here to note only salient facts as to the major items.

The depreciation expense and abandonment loss arose out of machinery and equipment admittedly owned by Bordo but loaned by it to Pitt; the salary and travel expenses were those of Bordo's officials incurred in traveling to Baltimore for consultation with Pitt's officials; and the legal and accounting fees related mainly to Pitt's liquidation and the defense of a lawsuit filed against both Pitt and Bordo by Pitt's landlord, a lawsuit ultimately settled by Bordo.

Defendant agrees that the resolution of this issue "is directly related to the determination of the debt-equity issue." Since the latter issue has been resolved in favor of plaintiff, it logically follows that this secondary issue must likewise be resolved for plaintiff.

However, of "additional concern here," says defendant, is whether Bordo received the benefit of these expenses so as to be entitled to their deduction. In defendant's view only Pitt benefited from these expenses.

This specious argument deserves but little comment. From the record it is entirely clear that, while Pitt was indeed an incidental beneficiary of these expenses, it was Bordo who primarily benefited therefrom. Therefore, Bordo, not Pitt, is the taxpayer entitled to the deduction.

Plaintiff is entitled to judgment with the exact amount of recovery to be determined pursuant to Rule 131(c).

NICHOLS, J., concurs in the result.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect, with the determination of the amount of recovery to be reserved for further proceedings under Rule 131(c) in accordance with this opinion.

**HEAVEN HILL DISTILLERIES, INC.**
v.
**The UNITED STATES.**
No. 372–68.

United States Court of Claims.
April 13, 1973.
As Amended May 24, 1973.

David Sachs, New York City, for plaintiff; John Tarrant, Louisville, Ky., attorney of record. Myer Galanter, Louisville, Ky., Paul J. Bschorr, New York City and Tarrant, Combs, Blackwell & Bullitt, Louisville, Ky., of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Gilbert E. Andrews, Jr. and James C. Bergner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG, and .BENNETT, Judges.

## OPINION

PER CURIAM:*

The ultimate issue is whether plaintiff corporation, a distiller of bourbon whiskey, may currently deduct in its fiscal years 1962–64 the expenses of "carrying charges" for storing the whis-

---

\* This opinion incorporates the greatest part of the opinion prepared by Trial Commissioner C. Murray Bernhardt, with modifications and additions by the judges.

key in barrels in its warehouses while it ages and awaits customers, rather than adding such carrying charges to the cost of its bulk whiskey inventory and deferring recovery of the charges to ultimate sale or disposition. While the plaintiff expensed all such carrying charges, including those associated with the storage of whiskey sold in bulk to others (about 95 percent of its production), the present claim relates only to those carrying charges associated with the whiskey which plaintiff owned, i. e. which it bottled on its own account and under its own labels for wholesale disposition by the case, or which it sold in bulk after the year of production. In deciding this question, the dispositive issue is whether the aging of the whiskey is part of its manufacturing or production process. If it is not, defendant concedes it has no defense.

Since its inception in 1946 the plaintiff has engaged in distilling, storing during the aging period,[1] and selling bourbon whiskey in the State of Kentucky. After distillation the raw ("cistern") whiskey is entered into 50 or 51 gallon white oak barrels which have been charred on the inside. The barrels are then stored in plaintiff's warehouses, which have no temperature or humidity controls. While the barrels are thus stored their contents, through chemical interaction between the whiskey and the charred interior surfaces of the barrels, gradually change in color, aroma, and taste. This is the aging process which takes place automatically without human or mechanical intervention, except for routine checking of the barrels for leaks, random sampling before bottling, and sporadic rotation of some barrels in the warehouses whenever time permits, although rotation is not necessary to proper aging and many barrels are not disturbed.

Each barrel in storage bears a separate serial number and the date when it is filled with raw whiskey and placed in the warehouse. That is the production date. Similar data is carried in plaintiff's inventory records. Because of the progressive chemical change that occurs in the barreled whiskey while aging in storage, each age acquires a distinctive quality with respect to its color, aroma, and taste that differentiates it from other barreled whiskey which has been in storage for a lesser or greater period of time. Whiskey stored for 2 years is called straight whiskey, and for 4 years or more it is called bonded whiskey when bottled and labeled.

Approximately 95 percent of plaintiff's production is sold in bulk to purchasers, some of it being bottled for them. The rest is retained and bottled by plaintiff under its own labels for wholesale case disposition. Heaven Hill labels are applied only to whiskey which is at least 4 years of age. The bulk whiskey is salable from the moment it is barreled and stored. During the tax years in suit from 67 to 77 percent was sold to customers during the first year of storage, and kept in storage for the customer until it reached the age desired, whereupon it was delivered in that form to the customer or, at the customer's direction and cost, bottled for him by plaintiff. The customer pays plaintiff storage charges from the date of purchase, which yields plaintiff a profit over its storage costs.

When plaintiff offers its bulk whiskey for sale the quoted prices vary according to the posted age of the product. Generally the price increases with the product's age. The difference in price approximates the accumulated storage charges for the longer period. But the chief determinant of price is the competitive factor of market supply and demand. Over the years there has been wide fluctuation in the price of bulk whiskey. Older bourbon whiskey is assessed an *ad valorem* tax by the State of

---

1. Defendant prefers to use its private label of "maturation period" for this phase, and to term as "maturation costs" the associated expenses rather than the here synonymous terms of storage or carrying charges. Any of the terms are applicable. Names do not change nature.

Kentucky at a higher value than younger whiskey. The State determines the value for tax purposes, which increases for each year of age, but whiskey of the same age and type by all producers in the State is assessed the same value. There is no necessary correlation between the assessed value of the whiskey for state tax purposes and its market value.

Since its incorporation in 1946 the plaintiff has consistently accounted for its bulk whiskey inventories by recording the average production cost of each barrel produced. Plaintiff's recorded production cost has included everything except the warehouse cost for the aging period, which warehouse cost the plaintiff has charged off to ordinary and necessary business expense under section 162 of the 1954 Code, or its predecessor counterpart. The warehouse cost per barrel is known. Only the warehouse costs attributable to the bulk whiskey inventory which plaintiff owns and bottles for its own account are in issue here, as stated before. The warehouse costs for bulk whiskey owned by plaintiff's customers and left to age in plaintiff's facilities are also currently deducted as expense on plaintiff's books, but these deductions are not part of our problem.

Plaintiff's certified public accountant has certified its financial statements, which expensed the warehouse costs, as being in accordance with generally accepted accounting principles and fairly presenting the results of plaintiff's operations, i. e., its net income. The approval of plaintiff's consistent practice of expensing its warehouse costs rather than adding them to inventory was based on the assumption that the storing of bulk whiskey while it aged was not part of the production or manufacturing process of bourbon whiskey, but represented only storage costs of a finished, salable product.

On audit of plaintiff's Federal income tax returns for fiscal years 1962 through 1964 the Commissioner of Internal Revenue determined that the storage costs were costs of production not to be deducted as period costs but deferred until sales of the inventory by capitalization or additions to inventory costs incurred in the year for goods held for future sale. Deficiencies were assessed and paid as itemized in findings 36 and 37, *infra,* claims for refund duly filed and disallowed, and this suit followed.

■ The plaintiff does not consider the storage interlude of its bourbon whiskey business to be manufacturing, or production, primarily because the product becomes salable the moment it is barreled and placed in the warehouse, two-thirds of total production being sold in the first year before it is matured enough to please the palate. Defendant contends that the storage phase (which it terms "maturation period," the costs of which are accordingly "maturation costs") is a continuation of the manufacturing process because whiskey of a particular age is a separate and distinct production from whiskey of any other age, and this distinction is recognized by the trade, the public, and by plaintiff in its pricing and record-keeping. The theory being, it is supposed, that older whiskey appeals to the more lucrative carriage trade, while greener whiskey has a less exacting constituency. Under the circumstances peculiar to this plaintiff's method of doing business, which may not necessarily apply to other members of the bulk bourbon industry whose procedures may differ in significant respects for all the record shows, we hold that the period from the deposit of the barreled bourbon whiskey in the plaintiff's warehouses to the time of its withdrawal therefrom constitutes storage rather than manufacturing, even though the whiskey is maturing the while. The necessary consequence of this conclusion is that the whiskey is a finished, salable (though not appetizing) manufactured product at the commencement of its storage.

There is no fixed all-purpose definition of the term "manufacture." *See* Duke Power Co. v. Clayton, 274 N.C. 505, 513–514, 164 S.E.2d 289, 295

(1968); 55 C.J.S. Manufactures § 1a (1948). See also the variety in 26 Words and Phrases (1953) under "Manufacture." Etymologically the term compounds from the latin words "manu" and "facere", literally, to make by hand. Machinery is metaphorically a mechanized extension of the human hand. In an industrial society manufacturing is no longer represented by the handcrafted products of an earlier cottage industry age, but rather is characterized by the production of goods in quantity through the concentrated employment of multiple labor, much material, and relatively large amounts of capital in the form of structures, divers machines, and abundant finances. Manufacture is not a technical word but has a common, ordinary, but elastic meaning. Sharpe v. Hasey, 134 Wis. 618, 620–621, 114 N.W. 1118, 1119 (1908). Its meaning varies too according to the context in which it is employed. For example, where it is used in a statute which extends or denies the benefits of a license or tax exemption to such classification, or in a customs provision applying a different duty to imported manufactures, it becomes important to apply a liberal or a strict construction according to the legislative purpose of the measure. The dictionary definition is of secondary value in the interpretive process. In the present case, the term is not used in the relevant tax statute, but nevertheless is involved in implementation of the statutory intent.

The most comprehensive judicial analysis of the term "manufacturing" exposed by research is found in In re I. Rheinstrom & Sons Co., 207 F. 119 (E.D.Ky.1913), aff'd 221 F. 829 (C.A. 6), appeal dismissed, 239 U.S. 11, 36 S.Ct. 1, 60 L.Ed. 119 (1915), where in concluding that the elaborate processing of Maraschino cherries constituted manufacturing with regard to establishing creditor priorities under a bankruptcy statute, the court painstakingly sifted and analogized numerous precedents.. Written 60 years ago, no case before or since *Rheinstrom* has made such a major effort. The message of much of the lengthy discussion there is that the processing and manipulation of agricultural or natural products into a form suitable for sale in the market does not constitute manufacture, so long as the article sold is the processed but recognizable form of the original or natural product, despite the labor and machinery necessary to achieve that result. But where the transformation of the product is too pronounced, and the processing too involved, as in the case of Rheinstrom's Maraschino cherries, then the end product may become a manufacture, having abandoned its original characteristics en route.

Thus the roasting, grinding and blending of raw coffee beans for commercial sale was held not to be manufacturing, nor the mixing of several varieties of tea into a blend for sale. People ex rel. Union Pac. Tea Co. v. Roberts, 145 N.Y. 375, 40 N.E. 7 (1895). And the purchase, slaughtering and sale of sheep ,and lambs, with byproducts of wool, hides, and rendered tallow (fat being chemically transformed through heat) was held not to be manufacture. "At most, they were merely prepared for market and preserved until sold." People ex rel. New England Dressed Meat & Wool Co. v. Roberts, 155 N.Y. 408, 412, 50 N.E. 53, 54 (1898). Grass cut into hay, then dried in the open and stored in a warehouse for a month before baling and shipment, in the course of which processing the native starch converted to sugar through natural forces to make a more nutritive fodder, was held not to be manufacture in the context of a customs law imposing a tariff on manufactured imports. Frazee v. Moffitt, 18 F. 584 (N.D.N.Y.1882). The court there found that

> * * * [T]he drying and any conversion of starch into sugar are mere incidents of the necessary cutting to enable it to be stored for food * * *. Dried apples would not be called a manufactured article, though the apple is peeled and cored and sliced, and dried by exposure to the

sun and manipulation. The substance of dried applies is still apples. * * * [18 F. at 587.]

In commenting on this case, *Rheinstrom, supra,* 207 F. at p. 142, observed that if there is a change made in converting grass into hay,

* * * [I]t is nature and not the farmer that makes the change, and hence the farmer cannot be said to be a maker * * *. He simply manipulates the grass, so that nature can do her work better. * * * [S]o far as there is a making, it is nature which does the making. * * *

*Rheinstrom* repeats this observation in equivalent language at p. 154. Note the similarity to the aging of whiskey in storage without manipulation or attention, and through the working of natural forces, quite comparable in principle to the sun-drying of apples or the starch-to-sugar metamorphosis in stored hay.

Even though whiskey in storage is, unlike less animate objects, in a state of internal flux and slow betterment while it rests in its congenial surroundings, nevertheless it at all times remains whiskey, and in plaintiff's practice at any and all times it is a salable if not an agreeably potable product when first it is distilled and barreled. It need not be ready to imbibe in order to be ready for sale. The distiller aims at the wholesaler as his target of sale, the wholesaler at his retailer, and the retailer at the drinker. (In its later life, whiskey is said in jest to have more public enemies and private friends than any known liquid comestible.) Only to the retailer and the consumer is the readiness of the product for normal consumption a matter of immediate concern, for the wholesaler's interest is primarily in the *potential* consumer attributes of the basic product, and he buys from the producer on the strength of that potential whether it is achieved at the moment of sale or not.

In Anheuser-Busch Brewing Ass'n v. United States, 207 U.S. 556, 28 S.Ct. 204, 52 L.Ed. 336 (1908), aff'g 41 Ct.Cl. 389 (1906), in ruling that the extensive chemical processing given to imported corks before their use as stoppers in exported bottled beer was not "manufacture" in the meaning of a statute authorizing the deduction ("drawback") of the duty paid on imported components of exported products, the Supreme Court said at p. 562:

* * * Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor, and manipulation. But something more is necessary * * *. There must be transformation; a new and different article must emerge, "having a distinctive name, character, or use." * * * A cork put through the claimant's process is still a cork. * * *

*Rheinstrom, supra,* 207 F. at p. 149, dialectically criticizes this statement in *Anheuser-Busch.* By transliteration of the cork situation to the whiskey one, whiskey is still whiskey after storage, albeit with a transformation in color, taste and aroma, but surely no more of a transformation than occurred to the Anheuser-Busch corks, which were actually given much more manipulation of a "manufacturing" nature than the inert storage treatment accorded the whiskey. Nor was the change made in the corks by manipulation any more pronounced than the transformation in the stored whiskey. In each case the basic substance to which the cork and aging were collateral, namely, beer and whiskey respectively, were manufactured products. In each case the product was changed so it could be used, with this difference: whereas the corks in their pristine imported condition could not be used as corks until thoroughly processed, our plaintiff's whiskey was usable for the purpose intended by its maker, namely, sale in bulk, at any time after when in raw state it was entered in the barrels, for plaintiff was in the business of bulk sales which did not require the whiskey to be potably aged at the time of sale.

Granted that this case is confined to the particular whiskey which the plaintiff did not sell in bulk but held and bottled on its own account for sale in case lots; nevertheless that area of its business was only incidental to its principal business. So far as is disclosed, the plaintiff had no program to set aside a particular portion of its annual production for its own use, but ostensibly left that decision to depend on the amount that was not disposed of to bulk purchasers.

The issue of whether whiskey aging in barrels subsequent to the distillation process was "work in process" has been considered in three recent cases. The first was Jack Daniel Distillery v. United States, 379 F.2d 569, 180 Ct.Cl. 308 (1967). The question arose in a somewhat different context than the instant one, specifically how the distiller's inventory of whiskey in barrels was to be valued at the time of sale of all the distiller's assets. The plaintiff in *Jack Daniel* contended that, once distilled, the whiskey was a distinct product, and that even while aging the whiskey could not be fairly valued without taking into account the prospective value of the right to bottle the whiskey product under the Jack Daniel label. The Internal Revenue Service contended that the aging whiskey in barrels was still "work in process"; and that until it had aged the requisite length of time it was not yet the distinct whiskey product identified under the Jack Daniel label. Thus the defendant argued that the tangible asset, aging whiskey in barrels, should be valued without addition of the value of the right to affix thereto the intangible label. The Court of Claims rejected defendant's contentions. The court agreed that the whiskey in barrels had some characteristics of "work in process", in that the distiller allowed it to age a certain number of years before bottling it for sale; nonetheless the court found that the whiskey in barrels was unlike "work in process" in many respects. The parties had agreed that Jack Daniel whiskey was, when sold at retail, a distinct product unlike any other whiskeys,

including bourbon whiskeys. The court found that the distinct qualities of the Jack Daniel product were generated at the time of the actual distilling process, prior to the barrelling of the whiskey. The aging or maturing of the whiskey was a natural process that did not add anything to the Jack Daniel whiskey that was unlike other whiskeys. The barreled product, while aging, was a "product" that had an ascertainable liquidation value whether or not it had aged to the point at which the distiller normally bottled it. Thus the court found that the whiskey in barrels did not fit the usual concept of "work in process"; and the court agreed with the plaintiff in *Jack Daniel* that the whiskey was already a distinct product that could not fairly be valued, even on the first day in barrels, without considering the value of the right to use the distinctive Jack Daniel label. It would seem that the factual analysis in *Jack Daniel* would *a fortiori* support plaintiff's position in *Heaven Hill*, since the instant plaintiff's whiskey, while it may have its devoted clientele, is not substantially unlike other bourbon whiskeys but is considered a salable product even in the raw state. In *Jack Daniel* it was not disputed that the distiller held *all* of its whiskey until aged a specified amount of time, and sold all of the whiskey under its own label as a distinct whiskey product. In the present case, the fact that plaintiff sells almost all of its whiskey in bulk at virtually any point in the time during which the whiskey is aging, two-thirds of it within the first year of storage, and that it holds some whiskey at least 4 years for bottling under its own label, would seem to reflect consumer preferences rather than the distiller's desire to create a distinct "aged whiskey" product.

A somewhat different result from that of *Jack Daniel*, was reached by the Tax Court in George L. Schultz, 50 T.C. 688 (1968) aff'd per curiam, 420 F.2d 490 (3d Cir. 1970), a case relied on here by defendant. In *Schultz*, the taxpayer purchased as an investment whiskey cer-

tificates covering numerous barrels of raw whiskey which he left in the possession of the distiller, originally planning (by his own admission) to leave the whiskey in storage until it had aged 4 to 5 years (although he ultimately sold it at a loss somewhat earlier). The court expressed its opinion that the storage of the whiskey while aging constituted part of the manufacturing process, albeit the aging process was a natural one not caused or aided by human instrumentality. The actual holding of the Tax Court, however, was that since the taxpayer had admittedly originally sought to acquire 4-year old whiskey, the storage and related expenses constituted part of the costs of acquisition of the capital asset, i. e., 4-year old (or older) bourbon. Thus, the Tax Court held that the storage costs should be capitalized rather than deducted annually as expenses. Despite the assertions of defendant to the contrary, the *Schultz* case is readily distinguishable from the facts of the instant case. The taxpayer in *Schultz* was not in the bourbon business or industry, but was an admitted speculator engaged in a limited investment transaction; and his original intent was to hold the whiskey until it had aged at least 4 years for sale at that time. Indeed, in affirming in *Schultz*, the Court of Appeals for the Third Circuit stressed that they were affirming on the facts of that case.[2] Further, *Schultz* has since been distinguished as above in a case involving a distributor of bourbon whiskey, *see* Van Pickerill & Sons, Inc. v. United States, 445 F.2d 918, 921–922 (C.A. 7, 1971).

An issue closely analogous to ours was considered by the United States Court of Appeals for the Seventh Circuit in Van Pickerill & Sons, Inc., *supra*. There the taxpayer was a wholesale liquor dealer who was also the exclusive distributor in certain counties of southern Illinois of a particular brand of bourbon whiskey. Taxpayer would purchase raw or "white" whiskey from the distiller, but the seller-distiller would retain possession of the whiskey in barrels in his warehouse until it had aged 4 or 5 years to conform to consumer tastes. The seller-distiller would pass on the storage costs, insurance charges, and *ad valorem* taxes assessed by the State of Kentucky, to the buyer-wholesaler on a regular basis. The taxpayer consistently deducted these assessments annually as expenses, but the Commissioner of Internal Revenue determined that this method of accounting did not clearly reflect taxpayer's income, under section 471 of the Code. The Commissioner argued that the aged whiskey ultimately sold by the taxpayer was a different product from the raw whiskey initially purchased; thus the storage and related costs should be added to the cost of the goods at the time of sale rather than deducted annually. The court rejected the Government's contentions in affirming the (unreported) decision of the trial court in favor of the taxpayer. There, as in the instant case, the expert accounting testimony on both sides, taken as a whole, supported both accounting methods as clearly reflecting income, without indicating that either was the "best" method.

The court noted that the taxpayer's method of accounting for these expenditures was widely used in the trade. As for the Government's "matching" theory, the same as the one urged in the instant case, the court stated:

> * * * [I]t appears that the decision by the Commissioner is more an expression of preference for capitalizing these charges rather than a determination that taxpayer's consistent use of its methods will not reasonably

2. The Third Circuit stressed that the entire transaction had to be considered, that storage and like charges are normally deductible as ordinary expenses but "they are not deductible where they are incurred as an integral part of a capital transaction", and that the Tax Court's determination "that the pre-payments here made were incurred as part of a capital transaction is essentially a factual determination" which was not clearly erroneous.

reflect income in the long run. * * * [*Id.* at 921.]

The court distinguished *Schultz, supra,* on the basis that that case involved a one-time speculator in bulk bourbon rather than one regularly engaged in the trade. The court concluded:

We realize that taxpayer's inventory of unbottled aging whiskey has some characteristics of work in progress. Yet, the applicable Code section and regulations appear designed to afford taxpayers the type of flexibility exercised * * * [by this taxpayer]. [*Id.* at 922.]

■ While the decision in *Van Pickerill* is not binding on this court, the reasoning of that case is entirely persuasive, and is not distinguished merely because that taxpayer was a wholesaler and the instant plaintiff is a distiller.

With this preface as background, three principal reasons occur why the storage of plaintiff's whiskey did not amount to manufacture or production. In the first place, during its storage the whiskey was having nothing done to it to promote or create its aging; instead it was doing something to itself through natural forces. If this is an epigrammatic formula it is also true, and it corresponds to the situation of the hay which, during storage, is through natural forces converting its starch into sugar to enhance its utility. As with the hay, no manipulation by labor or material occurs to the whiskey during storage which is the efficient cause of the chemical change taking place in the product. The pot is being stirred by the invisible hand of nature.

Second, in the plaintiff's scheme of things the storage phase is intermediate between the distillation and barreling stage on the one end, and the sale or disposition stage on the other. This intermediate aging stage is more closely identified with the sales phase than with the manufacturing phase, for when the plaintiff places its newly filled barrels of raw whiskey in its warehouses it is symbolically placing its merchandise on the shelves of its shop for sale as a finished product. Once it is barreled and stored it awaits sale, and various factors may affect its salability, including supply and demand, age, source, quality, reputation of its maker, etc. These are only selling factors. With the plaintiff the sale of nonpotable raw whiskey in bulk is its business *raison d'etre,* and its bottling of its own whiskey on its own account is a minor sideline.

■ Third, is the concept expressed in *Van Pickerill & Sons, Inc., supra,* that where, as in this case, the correct tax status of the disputed costs is closely in balance and they can reasonably be considered not to be part of production or manufacturing, and the taxpayer has consistently so treated them, the Code and the applicable regulations authorize that treatment.

■ As a general proposition, a taxpayer is not restricted to using any particular method of accounting. Section 446(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 446(a) (1970). However, section 446(b) of the Code provides in pertinent part:

* * * [I]f the method [of accounting] used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

With particular reference to inventories, section 471 of the Code provides:

Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming *as nearly as may be to the best accounting practice in the trade or business* and as *most clearly reflecting the income.* (emphasis added).

Turning to the regulations prescribed by the Internal Revenue Service, section

471 of the Code is discussed at 26 C.F.R. § 1.471–2 (1972). Subsection (a) of the regulation reiterates that inventory accounting must conform "as nearly as may be" to the best accounting practice in the industry, and must clearly reflect income. Subsection (b) provides the following guidelines:

> It follows, therefore, that inventory rules *cannot be uniform* but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. In order clearly to reflect income, the inventory practice of a taxpayer should be consistent from year to year, and *greater weight is to be given to consistency than to any particular method* of inventorying or basis of valuation *so long as the method or basis used is substantially in accord with* §§ *1.471–1 through 1.471–9.* An inventory that can be used under the best accounting practice in a balance sheet showing the financial position of the taxpayer can, as a general rule, be regarded as clearly reflecting his income. (emphasis added).

Of the regulatory provisions cited in the above quoted paragraph, defendant relies on 26 C.F.R. § 1.471–3(c) (1972), which provides in general terms that the cost of an inventory includes "(1) the cost of raw materials and supplies entering into or consumed in connection with the product, (2) expenditures for direct labor, (3) indirect expenses incident to and necessary for the production of the particular article * * *."

■■ The statutory scheme strongly reflects a congressional intent to allow flexibility to taxpayers in accounting for expenditures, especially where, as here, the expenditure cannot with assurance be described as a production cost. If the substantial expert accounting testimony presented by both parties at trial shows anything, it shows that highly qualified professional accountants can differ radically as to the "best" method of accounting for the costs at issue here. It is undisputed that plaintiff has con-

sistently followed its present practice of expensing the storage costs since its incorporation in 1946. Section 1.471–2(b) of defendant's own regulations, quoted *supra,* explicitly provides that consistency is to be given the greatest weight in determining whether a particular method of inventorying clearly reflects income. The expert testimony on both sides conceded that either method here, plaintiff's or that urged by defendant, is in accord with generally accepted principles of accounting. That plaintiff's method does conform to generally accepted accounting principles is entitled to at least some probative weight. *See* John Wanamaker Philadelphia, Inc. v. United States, 359 F.2d 437, 441, 175 Ct.Cl. 169, 177 (1966). It is also undisputed that defendant accepted plaintiff's method of accounting for these expenditures on its returns from 1946 through 1961. As this court stated in Kennecott Copper Corp. v. United States, 347 F.2d 275, 303, 171 Ct.Cl. 580, 628 (1965).

> The fact that the Commissioner of Internal Revenue is not estopped by previous action in relation to similar expenditures from applying a different treatment to the expenditures in the instant case does not mean that his earlier action or similar outlays is wholly without significance.
>
> * * * *The question is not estoppel of the Commissioner, but the persuasiveness of prior experience in determining the classification of the* * * * *expenditures* [at issue] *as expenses* * * *. (emphasis added).

It has also been squarely held in this court that storage expenditures similar in nature to those at issue here can be deducted as expenses rather than added to inventory costs or costs of acquisition of capital assets. Higgins v. United States, 75 F.Supp. 252, 110 Ct.Cl. 204 (1948) (storage costs of turpentine).

Taken as a whole, the expert accounting testimony on behalf of plaintiff does not urge that plaintiff's method of accounting for the costs is the only or the

best method of treating these expenditures; rather it indicates that both methods are in accord with generally accepted accounting principles; that both methods are widely used in the bourbon distilling industry; and that either or both methods will clearly reflect income over a time if consistently applied. The testimony on behalf of the defendant does not undermine these basic propositions, but rather urges that adding the costs to inventory costs is better under the "matching" theory, which in turn reflects a "trend toward realism." Yet the latter testimony seems to reflect not what the best accounting practice in the industry actually *is*, but rather reflects the preference of the defendant's accounting witnesses, and the Internal Revenue Service, for what the best accounting practice *should be*. Fairly considered, there is not much to choose from between these opposing points of view, and the determination defendant urges be made would not seem to be appropriate for this court based only on a preference of the Internal Revenue Service. This being so, the better view is to rely on the flexible approach evidencd in the Code, and resolve the issue in favor of the instant plaintiff since, if there is doubt as to the production-related status of the expenses involved, the plaintiff's position is certainly reasonable and substantial and has been long and consistently maintained. *Cf.* Cincinnati, New Orleans and Texas Pac. Ry. v. United States, 424 F.2d 563, 191 Ct. Cl. 572 (1970).

The mere fact that, as our findings show, "each bourbon whiskey of a different age, or year's production, is a qualitatively different and unique product", does not contradict this conclusion. Many products which are the same for common-sense, over-all, and tax purposes can be called "qualitatively different and unique" for marketing or chemical purposes. Proper tax treatment need not be dominated by such a description. The equi-balance of the accounting evidence, the reasonableness of plaintiff's position, and the consistency of its treatment of the disputed costs outbalance this simple characterization of each year's bourbon as different.

Since plaintiff has established the correctness of its position, it follows that it is entitled to recover a tax refund in the full amount of its claim ($65,071.76), with interest thereon as provided by law.

**J. O. JOHNSON, INC.**
v.
**The UNITED STATES.**
**No. 308–72.**

United States Court of Claims.
April 13, 1973.

