**BROWN–FORMAN DISTILLERS CORPORATION**

v.

**The UNITED STATES.**

No. 332–70.

United States Court of Claims.
July 19, 1974.

N. Barr Miller, Washington, D. C., attorney of record, for plaintiff; J. Marvin Haynes, Walter D. Haynes and David L. Miller, Washington, D. C., of counsel.

Allan C. Lewis, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant; Joseph Kovner and Gilbert E. Andrews, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, and NICHOLS and KASHIWA, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's motion, filed May 10, 1974, moving that the court adopt the recommended decision, filed April 5, 1974, by Trial Judge Lloyd Fletcher, pursuant to Rule 134(h), as the basis for its judgment in this case, defendant having filed no notice of intention to except thereto and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the said recommended decision, as here-

inafter set forth,* it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c)..

## OPINION OF TRIAL JUDGE

FLETCHER, Trial Judge:

In this case plaintiff seeks a refund of income taxes for the fiscal year ended April 30, 1963. The plaintiff's claim arises out of the disallowance by the Commissioner of Internal Revenue of amounts which plaintiff claimed as investment credit on the cost of six whiskey maturation (or aging) facilities placed in service by the plaintiff during the fiscal year involved.

The sole question involved is whether plaintiff's facilities for the maturation and storage of its bourbon whiskey qualify for the investment credit in their entirety, as plaintiff contends, or whether certain components of those facilities (walls, roof, and floors) should be excluded from qualification for the investment credit because such components are "buildings" or "structural components" of "buildings", as defendant contends. It is plaintiff's position that its facilities are not "buildings" for investment credit purposes because they are specially designed to function as mild ovens for maturing the whiskey stored therein by cycling the temperature of the whiskey and controlling the humidity, they contain no work space, and the enclosure must be retired contemporaneously with the other principal equipment with which they are integrated. In my opinion, plaintiff's position is well-taken and, accordingly, plaintiff is entitled to recover.

The facts of this case are set forth at length in the findings of fact. Here they will be summarized only as necessary to explain the basis for the conclusion reached in this opinion.

Plaintiff is engaged in the alcoholic beverage business. During the period in question, it engaged in two principal types of activities. One was the business of distilling, aging (or maturing), bottling, and marketing of bottled bourbon whiskey. Its principal premium brands of bourbon whiskey are "Old Forester" and "Early Times" which are distilled, aged, bottled, and marketed exclusively by plaintiff. It also engaged in the purchase of a variety of distilled spirits (other than bourbon), wines, and cordials, all of which it bottled and distributed for sale. The controversy herein involves only the production of the plaintiff's premium brands of bourbon.

During its 1963 fiscal year, plaintiff placed in service six maturation facilities. There facilities were used for maturation of bourbon whiskey prior to the bottling, labeling, and marketing thereof as 4-year-old bourbon whiskey.[1] Plaintiff has previously been allowed the investment credit on part of the cost of these facilities but claims entitlement to the credit on the entire cost thereof as tangible depreciable property with a useful life of more than eight years.

Prior to marketing its whiskey, plaintiff carries out five processes: (1) mashing, (2) fermentation, (3) distillation, (4) maturation (commonly called "aging"), and (5) bottling and labeling of the mature whiskey product for distribution. A number of variables determine the quality and character of such whiskey. Of importance among the several variables are the conditions under which the distillate is aged in the maturation facilities.

The fresh distillate from which bourbon whiskey is produced will be clear in color but harsh and unpalatable to the

---

* Whereas the court adopts the Trial Judge's separate findings of fact, which are set forth in his report filed April 5, 1974, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. The term "4-year-old bourbon whiskey" as used herein means bourbon-designated distillate which has been matured or aged after entry into new charred white oak barrels for a minimum of four years before being dumped for bottling.

taste. As the result of chemical changes which occur in the whiskey during its maturation, the raw or fresh distillate eventually becomes finished whiskey. In the course of this processing, fresh distillate is barreled in newly charred white oak barrels. Under Federal regulations, the distillate must be aged or matured in such barrels in order to be labeled and marketed as "bourbon whiskey". It must be aged for two or more years to be labeled and marketed as "straight bourbon whiskey". Plaintiff, however, requires that the fresh distillate which it bottles and markets as bourbon whiskey be aged and matured in such barrels for not less than four years.

During the maturation process, the whiskey-distillate acquires its mellow taste, aroma, and color. It undergoes chemical changes as well. Maturing is brought about by cycling, which is the alternate expansion and contraction of the whiskey into and out of the "red layer" formed underneath the char on the oak barrels. A rise in temperature causes the whiskey to expand into the layer and a lowering of the temperature causes a contraction of the whiskey. Alternate expansion and contraction set up a "push-pull" process within each barrel and through contact with the red layer, the raw distillate gradually acquires the characteristics of mature bourbon whiskey. At the same time, air is drawn into the barrels as a result of the partial vacuum created by the whiskey contraction, and the oxygen from this air heightens the changes occurring in the distillate. The chemical processes of maturation that give bourbon whiskey its characteristic color, taste, and aroma consist of (a) oxidation, (b) extraction of wood components from the barrel, and (c) chemical reactions between the liquid components. These chemical processes require heat, and, as a rule of thumb, for each 10-degree increase in temperature, the rate of chemical reactions within the distillate doubles. As the temperature drops, these chemical reactions slow down and if the temperature gets sufficiently cold, both the oxidation process and the other chemical reactions tend to come to a halt so that no maturity results. On the other hand, plaintiff believes (without contradiction on this record) that if the whiskey is overheated (temperature in excess of 90 degrees Fahrenheit), excessive amounts of wood materials are likely to become dissolved in the whiskey with a consequent decrease in quality.

By traditional means of maturation, the barrels of raw distillate are held for aging or maturation in unheated facilities under conditions in which no artificial temperature or air circulation controls are provided. See, for example, the distilling process described in Heaven Hill Distilleries, Inc. v. United States, 476 F.2d 1327, 201 Ct.Cl. 423 (1973), particularly finding 7. The only available changes in temperature for initiating a cycle of expansion and contraction of the distillate within the barrels are those provided by natural climatic conditions such as changes of the season and the velocity and direction of the outside air.[2] During summer, the whiskey expands into the charred barrel staves and then contracts back into the barrel with the coming of cooler weather, resulting in one cycle. If there is an early hot spell in the spring, followed by cooler weather before the onset of summer, another cycle may be achieved. At best, two cycles per year are all that can be expected by distillers who mature their whiskey under uncontrolled conditions. There is no doubt the maturation process takes place under these uncontrolled conditions; however, the distillate in different areas of such facilities mature at different rates because of the uneven temperature and air flow within the area and around the barrels. The usual means through which uniformity of quality is achieved by producers who use unheated maturation facilities is the rotation of the location of the barrels within the storage area.

2. Referred to in Heaven Hill, *supra* as "[T]he pot . . . being stirred by the invisible hand of nature." 476 F.2d 1335, 201 Ct.Cl. 436.

Dissatisfied with this uncontrolled method of maturation, the plaintiff, after years of maturation experiments, developed a process for artificial cycling of its barreled distillates. In its opinion this process results in a more uniform, mature whiskey with a greater mellowness and a more pleasing taste. Thus, in 1961, the plaintiff, with the aid of outside architects, developed the design of the facilities in question to carry out its artificial cycling maturation process. These six facilities were designed to achieve an even flow of air around all barrels of distillate and to perform a greater number of controlled cycles of higher and lower temperature of the air circulated in the enclosure in accordance with plaintiff's method of maturation. The new design also provided for a greater number of barrels per cubic foot of space, improved fire protection for the whiskey, elimination of some mechanical equipment for moving the barreled distillate, and greater convenience for the entry and removal of the barreled distillate.

During maturation, approximately 14 percent of the contents of each barrel evaporates into the air surrounding the barrels in each facility. Over the four-year maturation period, this results in evaporation in each facility of approximately 182,000 gallons. As a result of evaporation, the proof[3] (or alcohol content) of properly matured whiskey will increase because the white oak used to make the whiskey barrels will allow water molecules to evaporate through to the outside surface of the barrels and evaporate faster than alcohol molecules. Plaintiff usually enters its whiskey in the barrel at 103 proof and after four years of maturation it will come out at 112 proof or better.

Evaporation also provides an airspace which assists in the oxidation process. Plaintiff must remove the excessive humidity caused by this evaporation through the use of ventilation systems in each of the facilities in issue. If the humidity in the facilities is permitted to get too high, the evaporation from the barrels would not take place and maturation would not proceed satisfactorily; if there were an excessively wet atmosphere, there could actually be a loss of proof (rather than the desired gain) because water would be drawn into the barrel. Excessive humidity would also slow down the oxidation in the barrel or cut it off completely. In addition, with excessive humidity, the hoops on the barrels would rust, and mold would grow all over the wall surfaces, rick timbers, and the barrels themselves. If mold gets into the whiskey through the pores of the barrels, it is not marketable.

The interior of each of plaintiff's facilities is a massive honeycomb of wooden "ricks" constructed of heavy timbers. They serve to hold barrels of whiskey during the maturation period. Each facility is 172 feet by 270 feet in size and holds approximately 26,000 barrels of distillate. The facilities have front and back doors and a reinforced concrete center path between the two doors. This path runs between the two enormous grids of seven-tier high ricks and is used for loading and unloading distillate into and out of the facility.

The plaintiff's maturation facilities were constructed from the inside out. The ground level was first prepared with a predetermined slope for the movement of air and the drainage of moisture from the sprinkler system or broken barrels. On this inclined ground, parallel rows of concrete risers (dwarf walls) were installed at eight-foot intervals across the entire area of the enclosed facility. The honeycomb of ricks which supports the barrels was constructed on the top of the dwarf walls. These dwarf walls support the ricks and provide space and channels for the circulation of heated air beneath the lowest tier of barreled distillate and into the rick area above.

---

3. Proof designates the percentage of ethyl alcohol found in the distillate. Proof is approximately twice the pure alcohol percentage. Thus, 100 proof distillate is comprised of 50 percent alcohol.

On the floor between the dwarf walls, three-inch concrete slabs were poured on polyethylene sheets. With the exception of the reinforced five-inch concrete center aisle, however, none of such concrete slabs contain reinforcement and are not designed to support any load. The only true flooring in the enclosure is the center aisle. The function of the sloping slabs is to seal out ground moisture, radiate heat upwards, and insure proper drainage in case of barrel leakage or sprinkler activation. Sufficient air space is left between the barrels in the ricks to permit balanced cycling of heat and control of temperature. There is a "wet pipe" sprinkler system attached directly to the ricks to protect the maturing whiskey from fire. Electric lighting is provided only in the center aisle and the catwalk surrounding the ricks.

The heating system in the facility is composed of steam pipes suspended from the ricks in the space between the dwarf walls located underneath the ricks. The heating system permits the temperature and humidity (as a function of temperature) of the air circulating around the barrels to be controlled to obtain the desired cycling activity within the barrels. Heat is circulated and controlled with the aid of a series of exhaust fans and vents located in each facility.

This grid-like complex of ricks and related equipment is fully enclosed. The top cover or roof of the structure is supported by the hundreds of vertical posts of the ricks which extend above the top tier of the maturing distillate. The roof consists of planking nailed to timbers laid on top of these numerous vertical posts. On top of the planking, the roof contains one-half inch of insulation and a built-up outer cover of tarpaper, tar, and gravel. Air vents are located along the full length of the roof edge to aid in the movement of air. The roof is totally dependent on the vertical posts of the ricks for support. There are no rafters or vertical trusses to support it otherwise.

The walls of the structure are especially designed to insulate and control the growth of mold and mildew caused by the entrance of water vapor into the wall material. The construction is of four-inch brick on the exterior surface, a two-inch air space between the outer and inner surface, and a special type of highly impermeable clay building block on the inner surface. In the plaintiff's facilities some of the horizontal timbers of the ricks are connected to the walls. The ricks are designed with a pattern of diagonal cross-bracing that makes them rigid. Thus, by such connection, the rigid ricks are used to help support the walls. The roof which rests upon and is supported by the ricks also helps support the walls. Accordingly, both the top and sides of the enclosure depend upon the ricks for support. If they were removed, the roof of the maturation facility would collapse, and the walls which rely on the roof and to a lesser degree the ricks, would likewise eventually give way. Thus, it will be seen that all facilities in question are fully integrated structures entirely dependent upon the ricks for ultimate support.[4]

These specialized facilities are the core of the plaintiff's controlled maturation processes. During the year, they enable the plaintiff to cycle its aging distillate through nine or ten cycles of expansion and contraction into and out of the "red layer" of the barrels.[5] Throughout the colder months, generally November to April, the temperature in the facilities is raised so that the distillate in the barrels reaches a temperature of about 85 degrees, and this temperature is maintained for about a week. This is the expansion process which forces the whiskey into the red layers. The facilities are then cooled until the temperature of the distillate in the barrels is reduced to 65 degrees. This is

---

4. The cost of converting these specialized facilities to general purpose warehouses would approximate two-thirds of their original cost.

5. This is in contrast to the one or two cycles which would occur naturally under the so-called "uncontrolled" method.

the contraction process, and it creates a partial vacuum in the barrel which pulls the whiskey back out of the red layer in the barrel staves together with dissolved caramelized wood sugars and tannins as well as fresh air (oxygen).

The cooling process is carried out by drawing in cool outside air through the use of power-operated vents, roof vents, and exhaust fans. Except for the roof ridge vents which are controlled manually by chains reached from the center aisle, controls for operating these vents and exhaust fans are located outside the enclosed facility. From October to the following April, the heating process is carried out through the use of steam pipes running throughout the facilities and located underneath the ricks and between the dwarf walls.

Because of the enormous quantity of liquid distillate in each facility, the heat required to raise the distillate temperature 20 degrees (65 degrees to 85 degrees) is much greater than would be necessary to heat only the air in the facility. Plaintiff presented proof at trial to substantiate that the heat required to increase air temperature by 20 degrees in a facility the size of plaintiff's is less than two-tenths, of one percent of the amount of heat required to raise the temperature of whiskey the same amount. As designed and used by plaintiff, the facilities are similar in function to ovens and refrigerators used for the purpose of bringing about changes of temperature in the products contained therein.

During the warmer months of the year, the plaintiff tries to prevent the whiskey in the facilities from overheating. Even though the walls and roof are insulated, the whiskey will heat up during a period of prolonged high temperatures. Plaintiff utilizes the cooler night air by starting the fans, exhausting the warm air from within the facility and replacing it with cooler air. During these months, plaintiff also opens the ventilators along the ridge of the roof and leaves them open until arti-

ficial heating is begun in the fall. In this manner, plaintiff keeps the distillate in the barrels from heating to more than 80 to 85 degrees during the summer.

Satisfactory humidity control is achieved by plaintiff through its ventilation system. Relative humidity at 70 to 80 percent levels is achieved through the use of the ventilation system even during the summer months. This system produces the type of whiskey the plaintiff wants and also eliminates the mold problem.

Work carried on in the facilities in question by plaintiff's employees is minimal at the most and is incidental to the main purpose of these structures. Entry is made into the facilities by small work details to deposit barrels of raw distillate and to remove them when matured. From time to time whiskey in the barrels is tested, two men search for leaks and repair them when found, and an employee will open some manually operated vents, as required. The controls for the heating and power-operated ventilating systems are located outside the facilities so that activity necessary to cycle the distillate in the maturation process does not require entrance into the facilities. Few laborers and supervisors were required for the work done in the facilities. As of 1973 when plaintiff had 21 such facilities, in addition to the two leak hunters, two supervisors, four guards, and a security force, the plaintiff hired two seven-men crews to load and unload the facilities. For entering and removing barrels, ricking machines are used to raise and lower the barrels to and from the ricks. A crew will spend from 45 minutes to an hour loading or unloading a hundred barrels from a truck into the ricks or from the ricks to a truck. In heavy bottling seasons, eight truckloads of one hundred barrels each might be removed from the present 21 Utica facilities each day. In the winter, an employee enters each facility at least once every two weeks to check on temperatures. Except for such checks, that facility might be kept completely

locked and no entries made. During the summer, there may not be anyone in the facility except to check temperature and humidity once a month.

As with all other alcoholic beverage aging facilities, the maturing distillate is held in the facilities under Federal Government bond as required by the Internal Revenue Code and regulations. Entrance to the facilities, even though owned by plaintiff, may be gained only under supervision of employees of the Alcohol, Tobacco, and Firearms Division of the Internal Revenue Service who keep the keys to the locks on the facilities.

In order to qualify for the investment credit, it is necessary for plaintiff to show that the above-described maturation facilities fall within the definition of "section 38 property" as that term is defined in section 48 of the Code, reading, in pertinent part, as follows:

(a) Section 38 Property.—

(1) In general.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property

(i) is used as an integral part of manufacturing, production, or extraction * * *, or

(ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i). * * *

In addition, to qualify as "section 38 property," section 48(a)(1) of the Code also provides that the property must be

depreciable property and have a useful life of four years or more.[6]

Plaintiff contends that its whiskey maturation facilities qualify under both subparagraphs (1)(B)(i) and (1)(B)(ii) of paragraph (a) of Section 48 because such facilities are used as an integral part of the plaintiff's manufacturing and production of bourbon whiskey and, at the same time, constitute storage facilities used in connection with such manufacturing and production and finally, they are not buildings as the term "building" is used in Section 48.

Defendant responds with a threefold argument; first, that the facilities in question are specialized buildings rather than storage facilities; second, that they are not items of equipment; and, third, that they are not enclosures which have to be retired contemporaneously with the equipment being housed. These positions are premised essentially on what might be called a "look-alike" argument, i. e., since the facilities look like buildings, they must be *ipso facto* "buildings" as that term is used in section 48(a)(1)(B).

Strangely enough, this position is in direct contradiction to a consistent pattern developed by defendant's own ruling.[7] In Rev.Rul. 68–132, 1968–1 C. B. 14, for example, the Service examined a facility for bulk storage of potatoes and concluded:

Accordingly, notwithstanding its outward physical appearance as a building, the * * * facility * * * is a storage facility for investment credit purposes.

Similarly, in Rev.Rul. 68–209, 1968–1 C.B. 16, the Service denied the credit to

6. For allowance of the investment credit on 100 percent of the cost of "Section 38 property," Section 46(c)(2) of the Code provides that useful life of the property to the taxpayer must be eight years or more. There is no dispute between the parties that the useful life of the facilities and each of their components for purposes of computing depreciation is in excess of eight years.

7. "If the Treasury is to behave in a responsible and mature manner, it should not say one thing in administration and then say precisely the opposite in litigation." Eisenstein, A Critical View of the Treasury, 15 N.Y.U. Inst. 23, 24 (1957).

an overhead movable crane shelter and stated:

> Thus, the definition of the term "building" for investment credit purposes is stated in terms of function rather than physical appearance.

To the same effect, *see* Rev.Rul. 69–557, 1969–2 C.B. 3 and Rev.Rul. 71–489, 1971–2 C.B. 48.

The Service ruling in Rev.Rul. 69–557, *supra,* is particularly noteworthy because of the remarkable similarity of the facts there considered and the ones now before the court. Thus:

> In order to accomplish the moisture removing process under controlled conditions, the taxpayer uses a facility known as a "dry-kiln." Essentially a dry-kiln facility includes a structure into which green lumber is placed, a heating system that provides the necessary temperature to draw the moisture from the lumber, and an exhaust system to remove the moisture from the enclosed structure.

> The taxpayer * * * constructed and placed in service four dry-kiln facilities during 1968. The structure of each of these facilities has a concrete base, two sides of tile, two sides composed of large sliding doors, and a built-up roof. They are 20 feet high, 44 feet long, and 210 feet wide. The width is divided into six chambers each 35 feet wide, sharing common walls and sealed off from one another. Each chamber contains heating coils, a spray system for steam, a sensing unit for control, fans for circulating the air, metal duct work for uniformly removing the moisture-laden hot air, and forced air venting fans. There is also a sprinkler system for fire protection.

> \*  \*  \*  \*  \*  \*

> The dry-kiln structures in the instant case are generally indistinguishable, except for their large size, from the shells or chambers of ovens. No work other than automatic processes is performed within the structures. The structures are entered by working personnel only to make repairs or adjustments to the equipment or machinery housed in the structure.

> Accordingly, it is held  *  *  * that the taxpayer's dry-kiln structures (including the control room structures) are not "buildings" under section 1.48–1(e)(1)(i) of the regulations, but are essentially items of machinery or equipment qualifying as "section 38 property" for investment credit purposes.

The similarities between the above-described drying kiln and one of plaintiff's whiskey maturation facilities are striking. Both have a concrete base, sides that include tile as a component, a built-up roof, heating coils, air circulation fans and a sprinkler system. Both function to apply heat and to control the humidity of the air in the facility in connection with the processing of a product. Both, except for their large size, are indistinguishable from ovens or chambers for applying controlled heating processes.

The courts are in accord with the foregoing administrative interpretation. Thus in Robert E. Catron, 50 T.C. 306 (1968) the United States Tax Court (in a decision reviewed by the entire court) held that one-third of a quonset-type structure, a specialized facility used solely for the cold storage of apples, qualified as a storage facility and was not a building under section 48(a)(1)(B). The remaining two-thirds of the structure were held to be a building. The Tax Court emphasized that appearance was in no way conclusive and looked to the function and use of the facility involved. Said the court at pages 310–311:

> Section 1.48–1(e)(1), Income Tax Regs., defines "building" in terms of common experience and understanding. The gist of the definition is that a structure in question is a building if it encloses a space within its walls, is covered by a roof, and has as its purpose the furnishing of shelter or housing, or of working, office, parking,

display, or sales space. The regulatory section provides in pertinent part as follows:

> (e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores.

There would seem to be relatively few structures not falling within the scope of this broad definition. Yet the statute itself (in the case of research and storage facilities), and the regulations (in the case of structures which are essentially items of equipment) certainly suggests that various structures which might arguably be considered buildings in a generic sense are not always buildings within the meaning of the statute. * * *

The regulations resolve the dilemma to an extent by engrafting a functional test which limits slightly the broad scope of our common understanding of "building." Thus, under section 1.-48–1(e)(1) of the regulations, *supra,* the basic definition of "building" is a structure with walls and a roof, but a "building," it is declared, typically provides space for certain purposes. The enumerated purposes, as mentioned, are the furnishing of shelter or housing, or of working, office, parking, display, or sales space. * * *

Likewise, in Central Citrus Co., 58 T.C. 365, 372–373 (1972), the Tax Court again applied the function or use test to allow the credit for specialized "sweet rooms" which functioned to control "shrinkage, ripening, color and the overall quality of the fruit."

On similar reasoning, a U.S. District Court in Kentucky has recently concurred with these decisions and held that sheds used solely for the aging and storing of tobacco in hogshead containers were section 38 property. Again, while the structures involved looked like "buildings," they were not so treated on the basis of the function and use test. Factors noted as important by the District Court were that the facilities provided no working space except as incidental to their main function as storage facilities (i. e., loading, unloading, and necessary maintenance), that they functioned only as storage facilities during the processing of tobacco products, and the fact that they were not reasonably adaptable for any other use. The external appearance of the structures was ignored. Brown and Williamson Tobacco Corp. v. United States, 369 F.Supp. 1283 (D.C., W.D.Ky., 1973), aff'd per curiam 491 F.2d 1258 (6th Cir. 1974).

Defendant's other arguments are, in the main, irrelevant. The fact that plaintiff's facilities have features in common with buildings has been shown not to be determinative under the ratiocination of the cases and rulings. The real inquiry is whether they are functioning or being used as "buildings" in the taxpayer's hands. In this connection a major inquiry has been whether the structures provide working space for employees that is more than merely incidental to the principal function or use of the structure. *See,* for example, Brown and Williamson Tobacco Corp. v. United States, *supra,* and Adolph Coors Co., 27 T.C.M. 1351 (1968).

From the foregoing, it can be readily seen that defendant's reliance on Sunnyside Nurseries, 59 T.C. 113 (1972) is entirely misplaced. There it was held that taxpayer's greenhouses, while important to the processing of growing plants, were nonetheless "buildings" because of the substantial amount of employee activity which took place in them. They were therefore not entitled to the invest-

ment credit. The court observed at pp. 119–120:

> \* \* \* A corps of petitioner's employees regularly spent full workdays inside the structures, engaging in a broad range of activities related to the processing of commercially marketable plants. As many as 50 persons sometimes worked in a greenhouse at once, often making use of an assortment of machinery and equipment. All of these characteristics are associated with "buildings" as that term is commonly understood.

Unlike the present case, the greenhouse facilities in *Sunnyside* plainly served as working areas in conjunction with their function of conditioning the environment. The case thus reinforces plaintiff's position. Here no substantial employee activity takes place in the maturation facilities. The basic activity consists of loading and unloading of goods, together with some maintenance and repair, all occurring at infrequent intervals of time.

As a last resort, defendant appears to rely upon dictionary and architectural definitions of "building" in support of its contention that plaintiff's maturation facilities are simply a specialized type of building. However, those definitions are of little help in the task of construing the statutory word and merely serve to introduce further ambiguity at best. The testimony shows that the architect tends to define "building" in terms of a common-features rationale rather than on a consideration of the structure's function or use which, as shown above, is the more important criterion. Likewise, the dictionary definition is (to use a currently popular word) counterproductive. While it defines "building" as a permanently constructed edifice with roof and walls, it clearly distinguishes it from a structure "not designed for occupancy \* \* \*". Webster's Third New International Dictionary (1966 ed., p. 292). Thus, we are reminded once again of Learned Hand's wisdom when he said in Cabell v. Markham, 148 F.2d 737, 739 (2d Cir., 1945), aff'd 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945):

> But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary.

Finally, in addition to qualifying as storage facilities under section 48(a)(1)(B)(ii), plaintiff's maturation facilities are also qualified for the investment credit under section 48(a)(1)(B)(i). That section includes within the definition of "other tangible property" (not including buildings or their structural components) property that:

> (i) is used as an integral part of manufacturing, production, or extraction \* \* \*

Reg. section 1.48–1(d)(2) defines "manufacturing, production, and extraction" in pertinent part as the:

> \* \* \* making of property \* \* \* by processing, manipulating, refining, or changing the form of an article, \* \* \*. Thus, section 38 property would include, for example, property used as an integral part of \* \* \* the processing of \* \* \* foodstuffs; \* \* \*.

Reg. section 1.48–1(d)(4) provides as follows with respect to the definition of "integral part":

> Property is used as an integral part of one of the specified activities if it is used directly in the activity and is essential to the completeness of the activity. Thus, for example, in determining whether property is used as an integral part of manufacturing, all properties used by the taxpayer in \* \* \* processing raw materials into the taxpayer's final product, would be considered as property used as an integral part of manufacturing. \* \* \*

The plaintiff's facilities obviously satisfy these regulatory criteria. They function as low temperature ovens during the cold months, temperature control units during the warm months, and hu-

midity control chambers throughout the year. All of these functions are integral parts of the processing of the plaintiff's finished product—an alcoholic beverage which, in the broad sense, falls into the category of foodstuffs. But, for the reasons already discussed, even if the court were to disregard the active and integral part that the facilities play in the maturation of the distillate into plaintiff's particular brands of bourbon whiskey, the structures would still qualify as section 38 properties because of their additional function or use as storage facilities.

Accordingly, judgment should be entered for plaintiff with the amount thereof to be determined under Rule 131(c).

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and judgment is entered to that effect, with the determination of the amount of recovery to be reserved for further proceedings under Rule 131(c) in accordance with this opinion.