**YELLOW FREIGHT SYSTEM, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 19674-3.**

United States District Court, W. D. Missouri, W. D.

June 23, 1975.

George E. Gibson, Reece A. Gardner, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for plaintiff.

Michael Howard, Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT FOR PLAINTIFF

WILLIAM H. BECKER, Chief Judge.

### FINDINGS OF FACTS

1. This is an action for the recovery of federal income taxes and assessed interest for the taxable years 1963, 1964, 1965, and 1966 in the total amount of $203,498.76 and interest thereon in accordance with law.

2. Plaintiff has complied with the prerequisites of filing a tax refund action in the District Court; i. e., it has paid the taxes, timely filed a claim for refund of such taxes and timely filed this action for the refund of such taxes. Jurisdiction of this action exists under Section 1346(a)(1).

3. Yellow Freight System, Inc. (hereinafter referred to as plaintiff), is an Indiana corporation which has its principal office in Kansas City, Missouri. The plaintiff, along with its various subsidiaries, operates a large truck transportation system in the United States. In 1963 through 1966 plaintiff caused certain facilities to be built at various points around the country. In addition, plaintiff erected fences as a part of several of these facilities to protect cargo in transit from theft and vandalism. The plaintiff claimed an "investment tax credit" for the costs of building these structures and erecting such fences. The Government disallowed plaintiff's claim for an investment credit on the costs of building the facilities including the fences. The disallowance of plaintiff's claim for an investment credit gives rise to this action.

4. Prior to December 9, 1968, plaintiff's name was Yellow Transit Freight Lines, Inc.

5. During the years 1963 to 1966, inclusive, the period involved in this case, plaintiff maintained its principal office at 92nd and State Line, Kansas City, Missouri, and was a regular route motor carrier engaged in the transportation of general commodities by tractor-trailer units and by trucks over approximately 17,000 miles of routes certified by the Interstate Commerce Commission in Arizona, California, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Missouri, New Mexico, Ohio, Oklahoma, and Texas. Through subsidiaries plaintiff was also engaged in long distance shipping between the midwest and southwest and major eastern seaboard terminals and in transporting products requiring refrigeration, but none of the properties involved in this case were used in those activities.

6. Plaintiff and its subsidiary corporation, as an affiliated group of corporations, filed a consolidated Federal income tax return for each of the years involved in this case.

7. Time for filing the consolidated Federal income tax return for the year 1963 was duly extended to September 15, 1964, and on or before that date plaintiff filed the return with the District Director of Internal Revenue at St. Louis, Missouri. The return reported taxable income of $4,067,591.21 and a tax liability of $1,931,-729.72, all of which amount was duly paid to defendant by plaintiff. In the return plaintiff claimed an investment credit of $130,725.88.

8. On September 11, 1967, plaintiff timely filed with the District Director of

Internal Revenue at St. Louis, Missouri, a claim for refund of income tax in the amount of $7,412.43, together with interest thereon as provided by law, for the year 1963, seeking the allowance of additional investment credit. Defendant allowed the claim to the extent of $1,176.42, which amount, together with interest thereon of $211.76, has been refunded to plaintiff. On May 18, 1970, defendant disallowed the balance of the claim in the amount of $6,236.01. Said amount was paid to defendant by plaintiff on June 25, 1964.

9. Time for filing the consolidated Federal income tax return for the year 1964 was duly extended to June 15, 1965, and on or before that date plaintiff filed the return with the District Director of Internal Revenue at St. Louis, Missouri. The return reported taxable income of $4,447,737.00 and a tax liability of $2,097,799.50, all of which amount was paid to defendant by plaintiff. In the return plaintiff claimed an investment credit of $154,791.00.

10. The Commissioner of Internal Revenue caused the return for 1964 to be examined and, as a result of such examination, increased taxable income by $19,069.00, decreased the investment credit by $4,452.35 and assessed additional income tax for 1964 of $13,986.85. On August 12, 1968, plaintiff paid to the District Director of Internal Revenue at St. Louis, Missouri, the said sum of $13,986.86 with interest thereon of $2,804.30.

11. On November 13, 1968, plaintiff timely filed with the Internal Revenue Service Center at Kansas City, Missouri, a claim for refund of income tax for 1964 of $7,885.31, or such greater amount as may be legally refundable, together with interest thereon as provided by law, seeking among other adjustments a reversal of the aforesaid decrease in the investment credit. Defendant allowed the claim to the extent of $2,671.85 income tax and $485.50 assessed interest and the aggregate amount of $3,157.35, together with interest thereon of $341.59, has been refunded to plaintiff. On May 18, 1970, defendant disallowed the remainder of the claim in the amount of $5,213.46 income tax and $1,045.28 assessed interest thereon. Said aggregate amount of $6,258.74 was paid to defendant by plaintiff on August 12, 1968.

12. Time for filing the consolidated Federal income tax return for the year 1965 was duly extended to June 15, 1966, and plaintiff filed the return with the District Director of Internal Revenue at St. Louis, Missouri. The return reported taxable income of $5,875,449.00 and a tax liability of $2,411,319.00, all of which amount was paid to defendant by plaintiff. In the return plaintiff claimed an investment credit of $456,033.57.

13. The Commissioner of Internal Revenue caused the return for 1965 to be examined and, as a result of such examination, increased taxable income by $116,323.29, decreased the investment credit by $122,649.50, and assessed additional income tax for 1965 of $178,484.68. On August 14, 1968, plaintiff paid to the District Director of Internal Revenue at St. Louis, Missouri, the said sum of $178,484.68 with interest thereon of $25,075.87.

14. On November 13, 1968, plaintiff timely filed with the Internal Revenue Service Center at Kansas City, Missouri, a claim for refund of income tax for 1965 of $175,659.98, or such greater amount as may be legally refundable, together with interest thereon as provided by law, seeking among other adjustments a reversal of the aforesaid decrease in the investment credit. Defendant allowed the claim to the extent of $30,132.85 income tax and $4,233.45 assessed interest, and the aggregate amount of $34,366.30, together with interest thereon of $4,597.55, has been refunded to plaintiff. On May 18, 1970, defendant disallowed the balance of the claim in the amount of $145,527.13 income tax and $20,445.57 assessed interest. Said aggregate amount of $165,972.70 was paid to defendant by plaintiff on August 12, 1968.

15. Time for filing the consolidated Federal income tax return for the year 1966 was duly extended to September 15, 1967, and plaintiff filed the return with the District Director of Internal Revenue at St.

Louis, Missouri. The return reported taxable income of $6,153,470.15 and a tax liability of $2,608,004.20, all of which amount was paid to defendant by plaintiff. In the return, plaintiff claimed an investment credit of $374,008.00.

16. The Commissioner of Internal Revenue caused the return for 1966 to be examined and, as a result of such examination, increased taxable income by $1,331,923.38, decreased the investment credit by $63,727.44, and assessed additional income tax for 1966 of $703,100.77. On August 17, 1970, plaintiff paid to the District Director of Internal Revenue at St. Louis, Missouri, the said sum of $703,100.77 with interest thereon of $132,835.14.

17. On July 26, 1971, plaintiff timely filed with the Internal Revenue Service Center at Kansas City, Missouri, a claim for refund of income tax for 1966 of $57,882.51, or such greater amount as may be legally refundable, together with interest thereon as provided by law, seeking a reversal to the extent of $57,882.51 of the aforesaid decrease in the investment credit. On August 30, 1971, defendant disallowed the entire claim.

18. On September 1, 1971, plaintiff filed its Complaint in this Court, and in this action seeks the refund of Federal income taxes and assessed interest in the following amounts, together with statutory interest thereon:

| Years | Income Tax | Assessed Interest | Total |
|-------|-----------|-------------------|-------|
| 1963 | $    557.41 | $ | $   557.41 |
| 1964 | 4,325.86 | 867.32 | 5,193.18 |
| 1965 | 113,047.65 | 15,882.41 | 128,930.06 |
| 1966 | 57,882.51 | 10,935.60 | 68,818.11 |
| Totals | $175,813.43 | $27,685.33 | $203,498.76 |

19. The following properties, which plaintiff placed in service in the years indicated at the costs indicated, are those on which plaintiff claimed and defendant denied investment credit. These are the only properties in controversy in this case.

| PROPERTY | YEAR PLACED IN SERVICE | LOCATION OF TERMINAL | COST |
|----------|------------------------|----------------------|------|
| Dock | 1966 | Albuquerque, N. M. | $ 85,435.44 |
| Dock | 1965 | Baxter Springs, Ks. | 24,922.82 |
| Dock addition | 1966 | Chicago, Ill. | 85,314.00 |
| Dock | 1965 | Cincinnati, Ohio | 57,160.67 |
| Dock addition | 1965 | Dallas, Texas | 182,902.05 |
| Dock | 1966 | Davenport, Iowa | 34,579.90 |
| Dock addition | 1966 | Dayton, Ohio | 16,737.46 |
| Dock addition | 1966 | Detroit, Michigan | 89,098.87 |
| Dock | 1965 | Flint, Michigan | 79,142.65 |
| Dock | 1965 | Houston, Texas | 134,081.00 |
| Dock | 1965 | Indianapolis, Ind. | 73,447.34 |
| Dock addition | 1966 | Joliet, Illinois | 17,483.44 |
| Dock | 1966 | Louisville, Ky. | 73,144.89 |
| Dock | 1965 | Peoria, Illinois | 20,668.65 |
| Dock addition | 1965 | San Antonio, Texas | 73,720.66 |
| Dock | 1965 | Sandusky, Ohio | 48,830.23 |
| Dock | 1964 | South Bend, Ind. | 39,951.00 |
| Dock addition | 1965 | St. Louis, Mo. | 530,487.89 |
| Dock addition | 1966 | St. Louis, Mo. | 303,356.75 |
| Dock | 1965 | Toledo, Ohio | 48,971.82 |
| Dock addition | 1966 | Tucson, Arizona | 6,599.77 |
| Dock | 1964 | Waco, Texas | 18,227.00 |

| PROPERTY | YEAR PLACED IN SERVICE | LOCATION OF TERMINAL | COST |
|---|---|---|---|
| Inspection lanes | 1966 | Albuquerque, N. M. | 82,479.36 |
| Inspection lanes | 1965 | Baxter Springs, Ka. | 67,560.07 |
| Inspection lanes | 1965 | Indianapolis, Ind. | 85,918.08 |
| Inspection lanes | 1965 | St. Louis, Mo. | 187,152.56 |
| Fences | 1966 | Albuquerque, N. M. | 6,186.00 |
| Fences | 1966 | Chicago, Illinois | 6,024.00 |
| Fences | 1963 | Dallas, Texas | 4,850.00 |
| Fences | 1963 | Detroit, Michigan | 3,113.00 |
| Fences | 1966 | Detroit, Michigan | 11,833.29 |
| Fences | 1966 | Louisville, Ky. | 5,368.82 |
| Fences | 1964 | South Bend, Ind. | 3,431.00 |
| Fences | 1966 | St. Louis, Mo. | 3,250.80 |
| Fences | 1964 | Waco, Texas | 189.00 |

All of the foregoing properties were constructed or erected by plaintiff after December 31, 1961. Depreciation is allowable with respect to each of the properties which, as of the time it was placed in service, had a useful life of 8 years or more for the purpose of computing the allowance for depreciation under Section 167 of the Internal Revenue Code.

20. There is included in the cost set forth in paragraph 19 of each of the docks at the terminals in Cincinnati, Davenport, Flint, Sandusky, and Toledo, the amount of $1,088.00 representing the cost of an enclosed and heated room located on the dock, approximately 10 feet by 12 feet by 8 feet high, used for the protection of cargo which would be damaged by cold temperatures. A room of the same size, cost and use is located on the dock at the terminal in Detroit, but the cost thereof is not included in the cost of the dock addition at Detroit set forth in paragraph 19. The costs set forth in paragraph 19 do not include any part of the cost of the office building or shop building at the terminal, or of the sleeping quarters for drivers referred to in paragraph 23 below.

21. The docks, dock additions and inspection lanes listed in paragraph 19 are, and during the period involved in this case were, used by plaintiff as an integral part of the furnishing of transportation services.

22. Other property and equipment used by plaintiff in carrying on its business of furnishing transportation services consist principally of trucks, tractor-trailer units, freight-handling equipment and terminals. In addition to the dock there is an office building at each of plaintiff's terminals involved in this case; there is a shop building at some of the terminals; and there are inspection lanes at the terminals located at Albuquerque, Baxter Springs, Indianapolis, and St. Louis. Each terminal is surrounded by a chain link fence 6 feet in height with (except at the Louisville and Waco terminals) three strands of barbed wire on an angled bracket attached to the top of the fence.

23. The docks are rectangular platforms in the form of a reinforced concrete slab normally 6 inches thick at a height of 48 to 50 inches from the ground, which are heights suitable for access to the beds of the trucks and trailers loaded and unloaded at the dock stalls (see paragraph 24, infra). Up to the platform level the docks consist of four concrete perimeter foundation walls which are normally supported by a continuous concrete footing but in some instances are supported by concrete pads, piers or pilings. At all of the docks involved in this case (except the dock at St. Louis and a portion of the dock at Indianapolis) the space under the platform is filled with dirt, and or other filling material. The slab at St. Louis and a portion of the slab at Indianapolis are supported by spandral beams on piers with no filling under the slabs.

There are sleeping quarters for drivers under the unfilled portion (112 feet) of the Indianapolis dock with a central core of toilets and showers for their use.

24. Each dock involved in this case has a preengineered metal roof structure consisting of steel columns (normally 11 to 12 feet in height) and crossbeams, at 22-foot intervals, with roof framing members consisting of 6-inch deep steel purlins running longitudinally on top of the crossbeams at approximately 5- to 6-foot spacings. Roof sheeting, consisting of 26 gauge (approximately 1/32" thick) enameled metal sheet panels, is attached to the top of the purlins and forms the roof. At terminals, of which the Detroit terminal is typical, the office floor is contained within the same perimeter foundation walls that surround the dock. There is an expansion joint between the office floor and the slab, and there are sometimes similar expansion joints at various intervals in the slab. The office floor is separately poured and is usually 1 to 2 inches lesser in thickness than the slab, but the tops of the office floor and the slab are flush. At the Detroit type terminals and also at the Albuquerque and Indianapolis terminals the roof which covers the dock extends as one continuous unit over the office building. The roof covers the entire area of the dock and extends approximately 8 feet beyond the slab so that it covers the access end of the vehicles parked at the stalls for loading or unloading. Each of the 22-foot intervals between the steel columns referred to above is a bay and each bay provides two 11-foot wide stalls up to each of which a truck or trailer can be backed for loading or unloading. At each of the 11-foot stalls there is attached to the dock a leveler. The levelers are of two types: (1) a torsion bar hinged-lip leveler or (2) a mechanical hinged-lip leveler. The levelers provide a ramp or bridge between the truck or trailer and the slab which forklifts and carts traverse in loading and unloading freight. The levelers also accommodate any differences between the heights of the slab and the bed of the truck or trailer, which often vary from 4 to 6 inches.

25. None of the docks are enclosed within walls. All of the bays of the docks at Indianapolis, Dallas, and St. Louis (which are in operation 24 hours a day, 7 days a week) are open at all times and have no doors. All of the stalls of the docks at all other locations involved in this case have sectional overhead doors which can be raised and lowered. When a stall is in use the overhead door at that stall is raised and the stall is open. All of the overhead doors are lowered during periods when the terminal is closed. The office building at each of the terminals involved in this case adjoins the dock.

26. The dimensions of the docks vary from the smallest at Waco which is 40' × 40' × 17' 10" to the largest at St. Louis which is 81' × 757' × 21' 2". The average number of trucks and trailers loaded and unloaded per day at the docks varies from 11 at Sandusky to 300 at St. Louis and the average number of shipments handled per day varies from 118 at Sandusky to 2,639 at St. Louis. The docks have overhead fluorescent lighting and there is a swivel arm spot light at each of the stalls which is used to illuminate the interior of the trailer which is at the stall for loading or unloading. The number of electrical outlets on the docks varies from 3 at Tucson to 69 at St. Louis. There is a writing stand at each dock bay which is used for signing delivery receipts, for making notations on freight bills regarding damaged or missing freight and for holding a clip board for bills of lading and related documents. There is a telephone on a few of the docks, two on the St. Louis dock and 3 on the San Antonio dock. There is one time clock on the Dallas dock and two time clocks on the St. Louis dock. None of the docks have air conditioning facilities. Only the docks at Davenport, St. Louis, and Waco have any heaters, which are overhead space heaters. There are no rest room facilities on the docks and, during the period involved in this case, there were no lunchroom facilities on any of the docks.

27. The transportation services which plaintiff furnishes its customers are divisi-

ble into categories as follows: "outbound service," "inbound service," "break bulk operations," and "interline operations."

28. "Outbound service" comprises picking up the freight to be transported by one of plaintiff's trucks directly from a customer within the commercial zone which a terminal serves. The freight is prepared for shipping (i. e., packed, crated, wrapped, etc.) by the customer. The bill of lading covering the freight is normally prepared by the customer on its own form or on the form provided by plaintiff or by the driver of the truck at the time he picks up the freight. In St. Louis and occasionally at other terminal locations the freight is picked up and brought to the terminal by trucks of local cartage companies rather than by plaintiff's trucks. The freight is taken by the truck to the terminal; the truck is backed up to a dock stall where the freight is unloaded either into carts or onto forklifts and moved to other stalls assigned for various destination cities; and the freight is loaded on the long-haul trailers which have been backed up to those stalls. In the event a trailer is not available for loading for the particular destination of the freight, the freight remains in the cart, or is stacked on the slab, until such time as a trailer for that destination is available. (The same is true for the operations described in paragraphs 29, 30 and 31 below.) Generally such freight does not remain at a terminal for more than 24 hours.

29. "Inbound service" is the opposite of outbound service. Long-haul trailers arrive at a terminal containing freight which has been shipped to customers in the commercial zone served by such terminal. The inbound long-haul trailer is backed up to a dock stall, the freight is unloaded and moved in carts or by forklifts to stalls assigned for loading freight destined for designated sections of the commercial zone and is loaded on trucks backed up to such stalls and is delivered by the trucks to the consignees of the freight. Trucks of local cartage companies are sometimes used to make such deliveries.

30. "Break bulk operations" take place at "break-point locations which in this case are Albuquerque, Baxter Springs, Dallas, Indianapolis, and St. Louis. Inbound long-haul trailers arriving at these terminals which are carrying freight destined for other locations are backed up to dock stalls, the freight is unloaded and moved by forklifts, or into carts which are then attached to a dragline (an in-the-floor chain conveyor which is controlled by automatic switching devices at various intervals along the dock) and pulled to stalls assigned to various destination cities where the freight is loaded on the outbound long-haul trailers which are backed up at those stalls for transportation to the ultimate destination. Regular outbound service and inbound service are also provided by plaintiff at those terminals for customers within their respective commercial zones.

31. "Interline activity" involves freight brought to plaintiff's terminal by trucks or trailers of another carrier and transferred therefrom in the same manner described above to outbound trucks or trailers of plaintiff for delivery to its destination.

32. The docks are designed and serve to provide a flat loading and unloading area under protective cover and readily accessible to transportation vehicles, convenience of ingress and egress in loading and unloading, efficient movement of freight from inbound to outbound vehicles, and assembling of freight for loading at maximum capacity with protection from damage (e. g. heavy freight at the bottom of the load and light freight at the top). They are specially designed facilities the function of which is to provide for the most economical, efficient and rapid transfer of freight from an incoming vehicle to an outgoing vehicle so that the freight may continue on to its final destination.

33. The number of employees (Dock Foremen, Working Foremen, General Dockmen, Checkers, Combination men and Forklift operators) who work on the docks range from a maximum of 6 supervisory, 72 full time and no part time employees per each 8

hour shift at the St. Louis dock to a minimum of 5 part time employees per each 8 hour shift at the Davenport dock.

34. The inspection lanes involved in this case are located at the "break-point" terminals at Albuquerque, Baxter Springs, Indianapolis and St. Louis. They are rectangular structures with a 6 inch concrete slab at ground level and have a roof structure similar to that of the docks. One end of such structure is attached to a wall of the shop building and the other end is covered with metal siding, except that in the case of St. Louis it is open. None of the inspection lanes are enclosed within walls. They are drive-through structures all of which are open on one side. The structures at Albuquerque, Baxter Springs and Indianapolis (but not at St. Louis) have sectional overhead doors on one side which can be raised and lowered. The dimensions of these structures are as follows:

|                | Width | Length | Height |
|----------------|-------|--------|--------|
| Albuquerque    | 75'   | 98'    | 19'    |
| Baxter Springs | 60'   | 182'   | 18'    |
| Indianapolis   | 70'   | 100'   | 17'    |
| St. Louis      | 74'   | 222'   | 16'    |

The length of each of the structures is divided into lanes at approximately 14-foot intervals which are partially separated by 8" x 8" metal uprights which support the roof structure and by posts where air, fuel, and water hoses and nozzels are hung and hand tools are kept. At Albuquerque there is a shallow depression in each lane which enables a service man on a dolly to inspect the underside of a tractor-trailer unit. At St. Louis there was a forced air heating system under the slab which operated in the winter months to melt snow and ice falling off the units being inspected. There are overhead space heaters except at Baxter Springs. None of the inspection lanes are air conditioned or have lunchroom or rest room facilities. The lanes have overhead fluorescent lighting, from 8 to 33 electrical outlets and floor drains. There is a telephone at Baxter Springs and two at St. Louis and a time clock at Albuquerque.

35. The inspection lanes are designed and used for the purpose of expediting the fueling, cleansing and inspection for safety and roadability of long-haul equipment (tractor-trailer units) at the time they arrive at a break-point terminal. Their purpose is to reduce to a minimum the time required to ensure peak efficiency of that equipment and to speed the flow of traffic.

When the tractor-trailer unit enters the terminal, it is immediately driven by the road driver to the inspection lane area and into a lane, if one is open, or is parked if the lanes are all full until one is available. The unit is then taken through an inspection lane where it is fueled, the tires are checked for inflation, the battery is checked for water level, the radiator is checked for coolant, the horn, brakes, lights and signal directors are checked and the windshield is cleaned. If necessary, parts are tightened or adjusted and burned-out light bulbs are replaced. Plaintiff's policy is that no other repair work be done in the inspection lanes. If the inspection shows that the unit needs any other kind of repair work, the unit is usually taken to the shop building where the repair work is done. When the inspection is completed the unit is placed in a ready lane for dispatch on to a further destination or, if it is to be unloaded at that terminal, the trailer is then backed up to the dock for that purpose. The inspection lanes are never used for inspecting or fueling vehicles other than long-haul equipment. The inspection lanes at all four terminals are in operation 24 hours a day, 7 days a week. An average number of employees are engaged in those operations for each 8 hour shift.

36. Loss of freight by theft, vandalism, and inadequate protection is damaging to plaintiff's ability to render service and its reputation for reliability. Substantial amounts are paid each year by plaintiff on claims for actual and indicated theft of freight, practically all of which occurs at the terminals. As a safeguard each of plaintiff's terminals is enclosed by a chain link fence 6 feet in height usually with three strands of barbed wire on an angled bracket attached to the top of the fence. Without the fencing plaintiff would be negligent in meeting its obligation to its customers.

## CONCLUSIONS OF LAW

■ 1. The docks, dock additions and inspection lanes involved in this case are not buildings or structural components of buildings within the meaning of section 48 of the Internal Revenue Code and are qualified investments under the provisions of section 46 of the Code. The properties eligible for such credit are defined by section 48 of the Code and the Treasury Regulations promulgated thereunder. In pertinent part, section 48(a)(1) during the years here in question defined "section 38 property," which is eligible for the tax credit, as:

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part . . . of furnishing transportation . . . services, . . .

Additionally, section 48(a)(1) then, as now, required that "section 38 property" be property with respect to which depreciation is allowable and having a useful life of four years or more.

The properties involved herein consist of certain structures (docks, dock additions and inspection lanes) and fences. The issue to be decided with regard to the structures differs from that to be decided with regard to the fences. The eligibility of the fences is discussed hereinafter in connection with conclusions of law No. 2.

Concerning the docks, dock additions and inspection lanes, the parties are in agreement that the structures are not "tangible personal property" but rather are "other tangible property." Further, the parties have stipulated that depreciation is allowable on the structures, that each structure had at the time it was placed in service a useful life of eight years or more, and that the docks, dock additions and inspection lanes were and are used by plaintiff as an integral part of furnishing transportation services (Standard Pretrial Order No. 2 and Stipulation of Uncontroverted Facts, Paragraph III, paragraphs 18, 19). The one issue that requires resolution is whether each of the structures is a "building" which is ineligible for the investment credit by virtue of the parenthetical phrase in section 48(a)(1)(B) excluding "a building and its structural components" from the definition of "section 38 property."

Two tests have been suggested for resolving the issue whether a structure is a "building" within the meaning of section 48 of the Internal Revenue Code. One is an "appearance" or "lookalike" test which considers merely the outward appearance of the structure. The Court of Claims, although rejecting the appearance test stated that the rationale for it is that if "the facilities look like buildings, they must be *ipso facto* 'buildings' as that term is used in section 48(a)(1)(B)." *Brown-Forman Distillers Corp. v. United States,* 499 F.2d 1263, 1269 (Ct.Cl.1974).

The second of the suggested tests is a "functional" test, which focuses on a structure's function or use. As explained by the Tax Court, the functional test:

. . . limits slightly the broad scope of our common understanding of "building." Thus, under section 1.48–1(e)(1) of the regulations, the basic definition of "building" is a structure with walls and a roof, but a "building," it is declared, typically provides space for certain purposes. The enumerated purposes . . . are the furnishing of shelter or housing, or of working, offices, parking, display, or sales space. These purposes are exemplary

and not all-inclusive. But . . . the definition of "building" [is] limited somewhat to the functions just stated. . .

*Robert E. Catron,* 50 T.C. 306, 311 (1958) (reviewed by the full court).

All cited authorities that have considered which test is more appropriate for determining whether a structure is a "building" within the meaning of section 48 of the Internal Revenue Code have now adopted the functional test and abandoned the appearance test. See *Thirup v. Commissioner of Internal Revenue,* 508 F.2d 915 (9th Cir. 1974); *Brown & Williamson Tobacco Corp. v. United States,* 369 F.Supp. 1283 (W.D.Ky. 1973, aff'd per curiam, 491 F.2d 1258 (6th Cir. 1974); *Brown-Forman Distillers Corp. v. United States,* 449 F.2d 1263 (Ct.Cl.1974); *Melvin Satrum,* 62 T.C. 413 (1974).

The reasons for adopting the functional test to the exclusion of the appearance test were cogently stated by Judge Ely, writing for the Court of Appeals for the Ninth Circuit in *Thirup,* the most recent of the several cases cited. The appearance test was rejected as "too imprecise" to achieve the Congressional purpose of encouraging improvements in the quality and quantity of American industrial products. The functional test, on the other hand, was viewed as promoting the Congressional purpose underlying the investment credit:

> The functional test carves out those types of general purpose buildings, such as "apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores," . . . that we think Congress intended to exclude from the investment tax credit. But the test preserves for the credit those specialized structures whose utility is principally and primarily a significantly contributive factor in the actual manufacturing or production of the product itself.

508 F.2d at 919.

■ The *Thirup* opinion speaks in terms of identifying those structures whose principal utility lies in their significant contributions to manufacturing and production

processes because it was a production facility (a greenhouse) that was involved therein. In the present case the structures involved are used in the furnishing of transportation services. Nevertheless, the principles stated in *Thirup* are applicable. Congress' definition of "section 38 property" to include property that is an integral part of the furnishing of transportation services, in addition to manufacturing, production, and the other activities specified in section 48(a)(1)(B)(i) of the Internal Revenue Code, indicates a purpose to promote improvements in the quality and quantity of transportation services no less than of industrial products. To achieve this purpose, the appearance test is, as stated in *Thirup,* "too imprecise," while application of the functional test would preserve for the tax credit specialized structures "whose utility is principally and primarily a significantly contributive factor" in the furnishing of efficient and reliable transportation services.

The function of the docks and dock additions involved herein is described in paragraph 28–32 of the Supplemental Stipulation of Facts, filed June 16, 1975. As is clear from those stipulated facts, the sole function of the docks and dock additions is to facilitate the transfer of freight from one truck to another, which transfer is necessary to the furnishing of efficient and reliable transportation services. The necessity for transfers of freight from one truck to another and the function of the docks and dock additions to facilitate the transfer is clearly established by the evidence.

The function of the inspection lanes is described in paragraph 37 of the Supplemental Stipulation of Facts. As is the case with the docks and dock additions, the stipulation itself makes clear that the inspection lanes serve a highly specialized function which expedites the performance of activities necessary to the furnishing of efficient and reliable transportation services. This function is further explained in paragraph 5 of the statement of David D. Padgett. While Mr. Padgett's statement focuses on efficiency and speed, it also bears emphasis that the safety of freight, truck

drivers and highway users in general is enhanced by the provision of these inspection lanes, which allow safety inspections to take place within the time constraints imposed by the competitive transportation industry.

■ Although the structures in question may have some features which are commonly associated with buildings (see paragraphs 23–25 and 36 of the Supplemental Stipulation of Facts), under the functional test these features while material, are not determinative of the question whether the structures are "buildings" within the meaning of section 48 of the Internal Revenue Code. It is clearly established that the concrete slabs which are the primary component of the docks and dock additions are designed and used for the sole purpose of securing optimum efficiency of transfers of freight in transit, while other components of the structures (e. g., the thin roof sheeting) provide the protection from the elements which a carrier is obligated to provide for the freight in transit entrusted to it. The protection provided is not complete, however, because the sides of the docks are open to the weather and the docks are unprotected from natural variations in temperature. (Only three of the twenty-two docks in question have heaters; none have air conditioners. See paragraph 38(s) and (5) of the Supplemental Stipulation of Facts.) As a result plaintiff is obligated from time to time to satisfy claims for damage to freight occasioned by exposure to water or extremes of temperature. (See paragraph 40 of the Supplemental Stipulation of Facts and Plaintiff's Exhibit 20.)

The admitted statements of Charles Kahn and his supplementary testimony (at pages 6–7 thereof) and of William Lucas (at page 3, paragraph 3) contain contentions that since some features of the structures involved herein provide shelter from the elements, a function usually assigned to the structures we call "buildings," the structures should be classified as "buildings" within the meaning of the Internal Revenue Code. Neither Kahn nor Lucas possess qualifications to express opinions on the material mixed questions of law and fact. Any shelter provided by the structures involved herein is incomplete. At least one side of each of the inspection lanes is open to the weather; at the large "break-point" terminals, the sides of the docks are open. At smaller terminals, the overhead doors are generally open during the hours the terminal is in operations, although they are closed during non-working hours. These facts clearly indicate that provision of shelter is not a primary function of the structures. Indeed, shelter is sacrificed to the demands of expediting freight transfers and preparation of long-haul equipment for the road, the functions for which the structures were designed and for which they are used.

■ The fact that *some* shelter is provided is not determinative of the issue before this Court. All of the structures considered in the opinion of other courts had structural features which unquestionably provided shelter to the people or things within. For example, in *Melvin Satrum, supra,* the structure had sides, a roof, and a floor, and beyond doubt it did shelter the chickens housed in the structure and the people who entered the structure. Yet the structure was held, upon application of the functional test, not to be a "building" within the meaning of section 48. To reason that a structure which provides some shelter, regardless of its primary function, must for that reason be considered a "building" is to adopt a standard of decision equally as rigid as the appearance test which the courts have now abandoned.

■ Nor is it determinative that some human activity takes place at the docks and inspection lanes. (See paragraphs 35 and 37 of the Supplemental Stipulation of Facts and Schedule IV appended thereto.) It was made clear by the Court of Appeals for the Ninth Circuit in *Thirup v. Commissioner, supra,* that the fact that employee activity takes place within a structure does not necessarily indicate that the structure's purpose is to provide working space, one of the functions of a "building" enumerated by Treasury Regulations § 1.48–1(a)(1), nor

does the amount of such activity determine the issue. Rather, "[t]he proper inquiry, which goes to the *nature* of the employee activity inside the structures, is 'whether the structures provide working space for employees that is more than merely incidental to the principal function or use of the structure.'" 508 F.2d at 919; See also *Brown-Forman Distillers Corp. v. United States, supra,* 499 F.2d at 1271.

The statement of Charles Kahn (at page 4 thereof) addresses the question whether the nature of the human activity at the docks is such as would require a holding that the docks are "buildings" within the meaning of section 48 of the Internal Revenue Code. His statement in this respect is that human activity taking place upon a structure which adds value to materials is the kind of activity which is normally associated with "buildings." His legal argument is outside the area of his expertise.

No value is added to goods on the docks in any strict sense of that phrase. Freight is prepared for shipping by plaintiff's customers (see Supplemental Stipulation of Facts, paragraph 29) and each item leaves plaintiff's docks in exactly the same form as it arrived. Even if it could be said that in some sense "value" is added to "items" by virtue of the activities taking place at the docks, decided cases indicate that addition of value through human activity does not make the structure within which such activity takes place a "building" within the meaning of section 48. For example, in *Thirup, supra,* the human activity within the greenhouse there in issue (preparation of soil, weeding, spraying with chemicals, pruning, and the like) seem clearly to have been performed for the purpose of adding to or enhancing the value of plants so that they would grow and their blossoms would be suitable for commercial sale. Nevertheless, the greenhouses were held not to be "buildings."

The unloading of freight from one truck, its movement to the proper stall, its loading onto another truck, and preparation of long-haul trailers for the road are not capable of full mechanization, just as the commercial production of flowers involved in *Thirup* is not fully mechanized. Human activity is essential, yet the necessity of human activity does not detract from its nature as being incidental to the docks' principal function of expediting preparation of long-haul equipment for the road. No attempt has been made by plaintiff to furnish the docks and inspection lanes with the amenities (i. e., restroom facilities, lunchrooms, seating facilities, heating and the like) that one usually associates with structures whose principal function is the provision of working space for employees. As the various stipulations in paragraph 38 of the Supplemental Stipulation of Facts clearly indicate, the docks and inspection lanes are not designed for workers' comfort, nor for their convenience except as it directly relates to the expeditious handling of freight on what is in many cases a twenty four hour a day schedule.

■ Defendant has offered as exhibits copies of building permits and related documents. While building permits may have been required for the construction of some of the facilities, applications for building permits in no way constitute a determination or admission by plaintiff that docks or inspection lanes are "buildings" within the meaning of section 48 of the Internal Revenue Code. In applying for such permits, plaintiff was simply recognizing that it is subject to the requirements of local law. The position of the Commissioner of Internal Revenue with respect to the classification of property as "tangible" or "personal" is that local law shall not be controlling. Treasury Regulations § 1.48–1(c). Similarly, local law has been deemed irrelevant for purposes of determining whether a structure is a "building" within the meaning of section 48 of the Code. *Sunnyside Nurseries,* 59 T.C. 113, 122 (1972). Equality of application of the law regarding the investment credit requires that the courts consider but not be bound by provisions of local construction ordinances in construing federal tax laws.

■ The statement of William Lucas, which has been submitted by defendant,

cites (at page 4) a number of definitions of the term "building." Whether drawn from dictionaries in general use or from specialized dictionaries, such definitions of the term "building" are of little assistance in determining what is a "building" within the meaning of section 48 of the Internal Revenue Code. Indeed, one court has viewed such definitions as introducing further ambiguity into an already complex problem of statutory construction and are in fact "counterproductive." *Brown-Forman Distillers Corp. v. United States, supra,* 499 F.2d at 1272. Consideration of the definitions cited by Mr. Lucas reveals that they rely heavily on providing examples of structures which are in everyday language called "buildings" and the functions such structures perform. The Commissioner has provided a similar type of definition. Treas. Reg. § 1.48–1(e)(1). The inadequacy of such definitions for deciding whether a particular structure is a "building" within the meaning of section 48 and hence ineligible for the investment credit is obvious.

■ Mr. Lucas also appears to have placed great weight on the fact that the architects who designed the structures involved in this case referred to the structures as "buildings." Plaintiff's architects are of course not experts in the field of tax law. Hence their use of the term "building" is of no assistance in determining the question here presented. As the court noted in *Brown-Forman Distillers Corp. v. United States, supra,* the architect who testified in that case used a "common features" rationale rather than a consideration of function in concluding that a structure was a "building." 499 F.2d at 1272. The same may well have been the case with plaintiff's architects. Or it may well be that the architects were using the term "building" in its broadest generic sense, as did plaintiff's officers and employees on occasion in referring to the structures in question in the plaintiff's records.

■ Mr. Kahn expressed the opinion that the structures in question are not uniquely designed or uniquely functional for the specific tasks for which they are now used, and that the structures could be easily converted to other functions with minimal effort and expense. Many of the examples of conversion given were extreme and the result of obvious bias. The opinion that a dock could reasonably be converted to a modern textile plant was entitled to no weight. In the case of each of the structures significant alterations (most obviously the addition of immovable walls) would be necessary to give the structures general utility for manufacturing, warehousing, or other business purposes. Indeed, in their present form the structures are of no use to plaintiff or anyone else except for the purposes for which they were specifically designed and for which they are used. The fact that expenditures for labor and materials might render a structure suitable for other uses does not alter the fact that the structure in its unaltered state is not a "building" within the meaning of section 48 of the Internal Revenue Code. See *Brown & Williamson Tobacco Corp. v. United States, supra.*

2. The fences involved in this case are other tangible property used as an integral part of furnishing transportation services within the meaning of section 48 of the Internal Revenue Code and are qualified investments under the provisions of section 46 of said Code.

During the tax years here in question, plaintiff constructed at several of its terminals chain link fences six feet in height and in most instances topped by three strands of barbed wire. (See paragraph 16 of Paragraph III of Standard Pretrial Order No. 2 and Stipulation of Uncontroverted Facts and paragraph 22 of the Supplemental Stipulation of Facts.) The cost of these fences is part of the base for the investment credit claimed in this case.

As in the case with the structures discussed previously, the parties are in agreement that the fences are not tangible personal property. They have stipulated that the fences meet the statutory requirement of being depreciable property having a useful life of eight years or more. (Standard Pretrial Order No. 2 And Stipulation of

Uncontroverted Facts, Paragraph III, paragraph 18.) The issue with regard to the fences is not whether they are "buildings" within the meaning of section 48 of the Internal Revenue Code, for clearly they are not. Rather, the issue is whether the fences are used as an "integral part . . . of furnishing . . . transportation services.

As defined in Treasury Regulations § 1.48–1(d)(4), the fences were used as an "integral part" of one of the activities described therein, namely the furnishing of transportation services. They were not merely "incidental" to the transportation services of the plaintiff, as contended by the defendant.

■ Under the common law, and now by federal statute (49 U.S.C. § 20(11), (12), (1970)), and by state statute (§ 387.180 R.S.Mo. (1969)), a common carrier such as plaintiff is liable to a shipper for any loss, damage or injury to property caused by the carrier. As is indicated in paragraph 40 of the Supplemental Stipulation of Facts and by Plaintiff's Exhibit 20, plaintiff has been required each year to pay claims for losses, some of which were clearly attributable to theft or pilferage and some of which appeared to be due to theft but could not be proved attributable thereto. The majority of losses attributable to theft or pilferage occurred at the terminals. This imposition of liability for loss (including loss due to theft or pilferage) is one indication of the importance to plaintiff of taking all reasonable precautions to safeguard the freight delivered to it by the various shippers.

Further, the statement of testimony of David D. Padgett, whose expertise in the furnishing of transportation services is established by his long association with the industry, emphasizes the importance to plaintiff of *preventing* losses in order to preserve its reputation for reliability of service. Simply stated, a carrier's liability for losses, and its eventual payment of claims for such losses, is an inadequate substitute for prevention of losses in the first instance, from the point of view of both the shippers and the transportation company itself.

■ It is thus apparent that the taking of reasonable precautions to prevent loss or damage to freight is an essential element of the business of transporting goods, no less than the actual movement of the goods. It defies logic to contend that a transportation company such as plaintiff should accept goods for transport, be responsible for their safe delivery to their destination, and yet not consider that the fences were necessary for the taking of reasonable precautions to insure safe delivery of cargo, an integral part of its business of furnishing transportation services.

The chain link fences which were constructed by plaintiff at its terminals and for which the investment credit is claimed are used directly in the furnishing of transportation services and are essential to its completeness, in that the construction of the fences was a necessary action taken by plaintiff to reduce loss by theft or pilferage and thus fulfill its responsibility to its customers. Security guards alone would be inadequate, since guards could not be in all terminal areas at once. The fences are an essential complement to other security precautions serving to promote the objective of plaintiff's transportation business of efficiently and reliably moving goods to their destination. Mr. Padgett has stated his credible expert opinion that the fences are used directly in the furnishing of transportation services and are essential to the completeness of the activity.

3. Under section 38 of the Internal Revenue Code plaintiff is entitled to investment credit of 7 percent of the cost of the docks, dock additions, inspection lanes and fences involved in this case.

This conclusion of law No. 3 follows from the foregoing findings of fact and conclusions of law. No further explanation is required.

### FINAL JUDGMENT

Based on the foregoing findings of fact and conclusions of law, it is hereby

ORDERED and ADJUDGED that the plaintiff have and recover of and from the defendant the sum of $203,498.76 and interest thereon in accordance with law.